Gary M. Gaertner, Jr., Judge
Introduction
Bridgette Sughero (Sughero) appeals the judgment of the trial court in favor of Wireless Receivables Acquisition Group, LLC (Wireless) on Wireless' petition for judicial foreclosure. Because we find the judgment is supported by substantial evidence, we affirm.
Background
Sughero became a widow in 2006, and following the death of her husband, she went to Pulaski Bank (Pulaski) to pay off an outstanding home equity loan that she and her husband had opened years earlier, Sughero testified her husband had always handled their financial matters and she was unfamiliar with banking processes, but her husband had told her to pay off their home equity loan, so she went to Pulaski for that purpose. That same day, bank officials offered her a new home equity line of credit (HELOC), which she testified she did not want to open, but eventually she agreed to open the account. The HELOC had a maximum principal amount of $30,250, and was secured by a deed of trust on Sughero's house, which Sughero executed. Sughero did not initially receive the funds, rather the bank gave Sughero a checkbook to use to draw on the account, or she could come into the bank personally to access the loan funds.
Sughero testified that she did not want to use the HELOC funds because she knew it was a loan, so she put the checkbook in a desk in her bedroom and left it there. She first used the HELOC funds in February of 2009, when she wrote a check for $9,500 to her son-in-law, Paul Mudd, Sr. (Mudd, Sr.), as a loan for his business. Sughero testified that her agreement with Mudd, Sr. was that he would make the required payments on the loan directly to Pulaski. Sughero also testified this was the only authorized use of the HELOC funds she made. There were no other authorized users on the account, and she had not authorized a power of attorney.
From March through December of 2009, 11 additional HELOC checks cleared, along with one check by phone transaction, totaling $22,559.95. These transactions each ranged from less than $100 to $5,000. Nine of the checks were made out to Sughero and deposited into Sughero's checking account at Bank of America. Sughero testified she did not authorize any of these transactions, and the evidence at trial showed the signatures on the checks were forged. Sughero stated that she had not received statements from Pulaski for the HELOC account, and that she did not expect to receive statements because she had not been using the account. Sughero testified that she also was not aware of the deposits into her Bank of America account. She explained she did not look at her statements from Bank of America because she knew that Social Security payments were deposited and bill payments came out automatically. Sughero did not become aware of the unauthorized transactions until November or December of 2009, when *459 Wells Fargo Bank returned an automatic mortgage payment drawn on her Bank of America account for insufficient funds.
In March of 2010, Sughero called Pulaski to use the HELOC in light of her mortgage payments being returned, and she learned that all available funds had been drawn from the account. Mudd, Sr. went with her to Pulaski, where bank officials gave her copies of the checks drawn on the HELOC and opened a fraud investigation. Though Pulaski's policy was that suspected fraud must be reported within 60 days of a statement containing errors, they started an inquiry as a courtesy. Bank officials testified that in order for them to investigate the matter further with Bank of America and any other banks involved, they needed Sughero to fill out a fraud affidavit, which was not in her file. The investigator's notes stated "no action was taken." A senior vice president for Pulaski testified that she interpreted this statement to mean that the proper documentation was not completed. Sughero testified no one from the bank offered her a fraud affidavit to sign.
Sughero came to believe that her grandson, Paul Mudd, Jr. (Mudd, Jr.), who was living with her at the time of the unauthorized transactions, had forged the unauthorized HELOC checks and made the phone transaction. Sughero also believed Mudd, Jr. had stolen her Bank of America debit card, Sughero's daughter looked in Mudd, Jr.'s truck and found statements from Pulaski and Bank of America, along with other pieces of Sughero's mail. While Sughero's family did not want her to have her grandson arrested, Sughero eventually filed a police report against Mudd, Jr. in December of 2010. Sughero also called Pulaski to check the status of the fraud investigation. The bank told her it had not pursued the matter further because it did not have a fraud affidavit.
Sughero received a notice of default on her HELOC account in June of 2014. Sughero made no further payments, and Pulaski filed a petition for judicial foreclosure. In October of 2016, Pulaski sold its interest in the HELOC to Wireless, who moved for party substitution and to amend the petition. At the time of trial, Wireless presented evidence regarding the default, showing that Sughero's balance also included some remainder of the initial loan amount of $9,500, though Sughero testified Mudd, Sr. had paid that amount in full. After a bench trial, the trial court found Sughero liable to Wireless for the outstanding debt of $37,378.62 and held foreclosure proceedings could begin. This appeal follows.
Standard of Review
Our review of a court-tried case is governed by the principles set forth in Murphy v. Carron, 536 S.W.2d 30, 32 (Mo, banc 1976). We will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. Id. We view the evidence in the light most favorable to the trial court's judgment, defer to the trial court's credibility determinations, and accept as true the evidence and inferences favorable to the judgment while disregarding contrary evidence. Holm v. Wells Fargo Home Mortgage, Inc., 514 S.W.3d 590, 596 (Mo. banc 2017).
Discussion
Sughero argues that the trial court erred in finding Wireless could foreclose on the deed of trust because Sughero did not default on the loan as a matter of law due to the fraud committed by Mudd, Jr. Given the applicable law regarding Pulaski's duty to its customers as well as Sughero's duty to report fraud, we find *460 that the trial court's judgment is supported by substantial evidence and does not erroneously declare or apply the law.
It is undisputed here that the evidence showed an outstanding balance on Sughero's HELOC and that monthly payments toward that balance had ceased. The terms of the promissory note and deed of trust allow foreclosure in the event of a default, which includes failure to make monthly payments. Sughero argues that a finding of default here is inappropriate, however, because she did not actually borrow the funds now in default but was the victim of fraud.
The Uniform Commercial Code (UCC) governs the transactions here. Section 400.3-401(a)[1] provides that "[a] person is not liable on an instrument unless (i) the person signed the instrument" or the person's authorized agent or representative signed it. However, Section 400.4-406 more particularly addresses forged instruments, and subsection (c) creates a duty on behalf of the customer in certain circumstances to discover instances of unauthorized payments. First, the customer's duty is conditioned upon the bank sending statements of account or returning paid items to the customer. See Section 400.4-406, comment 1 ("A bank is not under a duty to send a statement of account or the paid items to the customer, but, if it does not do so, the customer does not have any duties under subsection (c)"). Section 400.4-406(a) provides statements should be "sufficient to allow the customer reasonably to identify the items paid" by including descriptions of paid items with the "item number, amount, and date of payment." A bank may also return paid items, such as processed checks, to the customer, but if it does not, the bank must "maintain the capacity to furnish legible copies of the items" and turn them over to the customer upon request. Section 400.4-406(b).
A bank's act of sending sufficient account statements to a customer then triggers the customer's duty under Section 400.4-406(c) to examine the statements and promptly report suspected unauthorized payments. Dean v. Centerre Bank of N. Kan. City, 684 S.W.2d 373, 375 (Mo. App. W.D. 1984). "[T]he customer must exercise reasonable promptness in examining the statement ... to determine whether any payment was not authorized ... because a purported signature by or on behalf of the customer was not authorized." Section 400.4-406(c). "Reasonable promptness" can be determined by the agreement for reporting fraud between the parties, but in no case may exceed one year. See Borowski v. J.P. Morgan Chase Bank, N.A., 522 S.W.3d 294, 300 (Mo. App. S.D. 2016) (analyzing Section 400.4-406(f), which creates one-year bar to customer's claim against bank for paying instrument with unauthorized signature; holding due to statute's policy in favor of imposing on customers duty of prompt examination, customers and banks are free to agree to lesser time period of reporting so long as not manifestly unreasonable). If a customer fails to discover and report fraud promptly, the customer must show "the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss" in order for the bank to bear any responsibility for the loss. Section 400.4-406(e); Dean, 684 S.W.2d at 375.
Here, Pulaski required customers to report suspected instances of fraud within 60 days, and Sughero does not claim such a time period is unreasonable. See Borowski, 522 S.W.3d at 300 (noting customer did not claim 60-day time period was unreasonable). Further, there was *461 substantial evidence on the record that Pulaski mailed monthly statements to Sughero and that they contained sufficient information under Section 400.4-406(a). Thus, Sughero had a duty to examine the statements and report any unauthorized transactions within 60 days of the statements containing the unauthorized transactions. It is undisputed that Sughero reported the first unauthorized transaction in March of 2010, approximately one year after its occurrence in March of 2009. At that time, the most recent unauthorized transaction took place in December of 2009.[2] Sughero claims she did not receive the statements due to her grandson's theft of her mail, and thus she could not have reviewed them for accuracy. However, Section 400.4-406 does not require the bank to ensure a customer receives the statements, but only to show that the bank sent the statements, which here is undisputed. Moreover, Sughero testified that she did receive an initial statement from Pulaski showing the $9,500 transaction and the monthly payment amount, but that she did not expect to receive further statements because she did not use the account again. She further testified she did not review her Bank of America statements because she knew her transactions were automatic payments.
Due to the finding that Pulaski sent sufficient statements, subsection (d) of Section 400.4-406 applies and precludes Sughero's ability to assert the unauthorized signature against the bank unless Sughero proved the bank failed to exercise ordinary care in paying the unauthorized items that substantially contributed to the loss. Section 400.4-406(e). "Ordinary care" means "observance of reasonable commercial standards," specifically, "[i]n the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this Article or Article 4." Section 400.3-103(7); see also Section 400.4-406, comment 4 (where customer's failure to examine statements leads to loss, "a bank should not have to share that loss solely because it has adopted an automated collection or payment procedure in order to deal with the great volume of items at a lower cost to all customers"). Thus, a bank must exercise ordinary care, but automated review of items presented for payment does not per se violate the bank's duty of ordinary care under the UCC so long as it conforms to reasonable commercial standards.
Here, the trial court found Pulaski's procedures for payment of instruments by automated means conformed to reasonable commercial standards, and this finding was supported by substantial evidence. Pulaski had an automated system that did not require an employee to compare the signature on every check paid to a customer's signature card on file, but rather due to the volume of checks processed by Pulaski, only transactions over $10,000 would be flagged for manual verification. The automated system also monitored the number of checks and their amounts on an account, and the system would alert the bank if there were variations on that activity. Due to the nature of the unauthorized transactions on Sughero's account, including the fact that the majority of checks were made *462 out to Sughero and deposited into her account at Bank of America, the automated system unfortunately did not flag any of them as suspicious. The initial transaction Sughero authorized was for $9,500, and all the subsequent transactions were at fairly regular intervals and for substantially smaller amounts. Under the circumstances, Pulaski exercised ordinary care in paying the checks under the relevant statutes.
Sughero notes comment 2 to Section 400.4-406(c), which states, "Whether the customer has failed to comply with its duties under subsection (c) is determined on a case-by-case basis," Sughero argues that the circumstances of Mudd, Jr.'s fraud, Sughero's limited familiarity with banking procedures, and the fact that she reported the fraud immediately upon discovering it are exceptional circumstances that should fulfill her duty under subsection (c). However, comment 2 states that a customer is not "necessarily preclude[d] ... from asserting its unauthorized signature ... against a bank in those circumstances in which under subsection (c) the customer should not 'reasonably have discovered the unauthorized payment.' " Section 400.4-406, comment 2 (emphasis added). The comment also includes an example of "exceptional circumstances" in which a customer would not be precluded from asserting an unauthorized payment against the bank: "For example, if a check is altered by changing the name of the payee, the customer could not normally detect the fraud unless the customer is given the paid check or the statement of account discloses the name of the payee of the altered check." The issue is whether the information the bank provided, either by account statement or return of the paid items, would be sufficient to alert the customer to any fraudulent activity.
The circumstances here are not exceptional circumstances as contemplated by comment 2. Pulaski sent statements to Sughero containing the transactions, including their dates and amounts, and that would have been sufficient to alert her to fraud under the circumstances here given the fact that Sughero only authorized one transaction on her HELOC account, and the statements showed multiple transactions. Had she seen the statements, or requested statements after not receiving any after her first one, she would have discovered the fraud within the time limit. Though Mudd, Jr. wrongly prevented her from seeing the statements, the bank fulfilled its duty to send Sughero proper documentation of transactions on the HELOC account, and thus Sughero had a duty under Section 400.4-406(c) to review the account activity or take action in light of not receiving her account statements.
Sughero did not notify the bank of the unauthorized transactions from March through December of 2009 until March of 2010, at which time it appears Pulaski nevertheless opened a fraud investigation. The parties disagree about why there is no affidavit of fraud in the file that Pulaski could have used to pursue its investigation further, but the trial court found Sughero's testimony that Pulaski did not offer her the opportunity to complete the required fraud affidavit was not credible and we defer to this finding. Regardless, the bank's 60-day time period for reporting fraud had passed, and there was no showing of a lack of ordinary care on the part of the bank that would create liability under Section 400.4-406(e). Thus, despite the unfortunate family circumstances for Sughero here, the trial court did not legally err in concluding that Sughero was liable for the balance on the HELOC, and subsequently that she was in default and foreclosure could proceed.
*463 Conclusion
Under the circumstances here, the trial court did not erroneously declare or apply the law, and its judgment is supported by substantial evidence. We affirm.
Lisa P. Page, C.J., concurs.
Colleen Dolan, J., concurs.

All statutory references are to RSMo. (2000), unless otherwise indicated.

This transaction was more than 60 days prior to Sughero's report of fraud; however, we note Section 400.4-406(d)(2) provides a 30-day reporting limit in cases of unauthorized signatures "by the same wrongdoer."